IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH HAWKINS, | ) | Case No. 5:20-cv-1245 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Kenneth Hawkins, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hawkins's application for SSI must be affirmed.

I.      **Procedural History**

On December 7, 2015, Hawkins filed an application for SSI.  (Tr. 189-94).[1]  Hawkins alleged that he became disabled on July 14, 2014, due to: "1. Severe Depression [and] 2. High Blood Pressure."  (Tr. 189, 226).  The Social Security Administration denied Hawkins's application initially and upon reconsideration.  (Tr. 92-122).  Hawkins requested an evidentiary

---

[1] The administrative transcript appears in ECF Doc. 15.

hearing.  (Tr. 137-39).  ALJ Amanda Knapp heard Hawkins's case on January 26, 2018 and denied the claim in a February 8, 2018 decision.  (Tr. 29-40, 46-90).  On September 13, 2019, the Appeals Council denied further review.  (Tr. 13-15).  On September 25, 2019, the Appeals Council vacated its earlier decision and granted Hawkins an extension of time to submit new evidence.  (Tr. 11).  On April 14, 2020, the Appeals Council again denied review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  On June 5, 2020, Hawkins filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Hawkins was born on July 13, 1957 and was 57 years old on the alleged onset date.  (Tr. 92, 189).  Hawkins graduated from high school and completed two years of college in December 1994.  (Tr. 227).  He had past relevant work as a linen room attendant.  (Tr. 38, 82, 234, 236).

On January 6, 2016, Hawkins completed a "Daily Activities Questionnaire."  (Tr. 545-50).  He lived alone in an apartment, where he spent most of his time watching television due to depression.  (Tr. 546, 548).  Hawkins performed daily housekeeping chores, such as washing dishes, but had difficulties with motivation due to his depression.  (Tr. 546).  However, he expressly disclaimed needing help with chores.  (*Id.*).  Hawkins could care for his personal hygiene and prepared his own meals daily without reminders or assistance.  (Tr. 546-47).  And he could shop without assistance and handle money.  (Tr. 547-48).

Hawkins further reported that he did not spend time with people and did not like to be around people.  (Tr. 548).  He did not have hobbies due to his lack of motivation.  (*Id.*).  Hawkins had trouble remembering appointments, calls, concentrating, and – by extension of the foregoing – following instructions.  (Tr. 548-49).  He had no problems finishing tasks but could

not concentrate enough to read.  (Tr. 549).  Hawkins took medication daily, previously used

"crack," and occasionally drank beer.  (Tr. 549-50).  His depression affected his daily

functioning because it would cause him to go to sleep and never wake up.  (Tr. 550).

### B.    Relevant Medical Evidence

The ALJ's decision summarized the relevant medical evidence.  (Tr. 29-40).  Although

Hawkins contends that the ALJ ignored and mischaracterized evidence, an independent review

does not reveal any material inconsistences between the ALJ's summary of the facts and the

record before this court.  *Compare* (Tr. 32-38), *with* (Tr. 319-724).[2]  Thus, the court adopts and

incorporates by reference the ALJ's summary of the medical evidence.[3]  The ALJ's summary of

the medical evidence is as follows:

> [Hawkins] had a full psychiatric intake in June 2013 related to an emergency
> room and crisis center visit.  He reported that he "took a lot of pills."  He ended
> up in the hospital due to attempted suicide via overdose.  [Hawkins] reported
> previous mental health treatment from Portage Path Behavioral Health in 2004-
> 2005.  He reported that his last use of alcohol was in 2007, when he consumed a
> 12-pack of beer per day to the point of blacking out. . . . [H]e admitted to the
> treating source that cocaine use dated back to 1998.  He used cocaine "every day
> all day usually about an eighth of an ounce."  [Hawkins] was convicted of drug
> trafficking in 2000, and of felony drug abuse in 2009.  He also reportedly
> completed an inpatient court ordered drug treatment program in 2009, but there
> were subsequent relapses.  [Hawkins] indicated that cocaine use ceased in May
> 2013, one month before the relevant assessment.  [Hawkins] became homeless
> when he relapsed, because he lived [in] a sober house.  He also lost his job.  Due
> to the stress related to these losses, he attempted suicide via overdose.  The social
> worker who performed the assessment suggested diagnoses of depression and
> cocaine dependence.  (3F/1-11 [(Tr. 500-10)]).

---

[2] Hawkins's argument in support of this contention and the court's reasons for finding otherwise are
discussed more fully below.

[3] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D.
Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted
by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd
by* 139 S. Ct. 1148 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v.
Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

On July 20, 2014, [Hawkins] was found unresponsive in the Chapel at the hospital.  He was admitted to the ICU, where testing showed cardiac and spinal abnormalities.  A treating physician noted that [Hawkins] had "extensive cerebral brain and neck imaging with not significant findings."  On July 24, 2014, [Hawkins] was transferred to a psychiatric unit.  He was diagnosed with acute encephalopathy secondary to cocaine use.  He was treated for hypertension.  The doctor noted right sided hemiparesis, but specifically documented a "suspicion that these complaints are due to malingering."  By the time of discharge, [Hawkins] regained full use of his right extremities.  (1F/68-161 [(Tr. 386-479)]).  He stayed in the psychiatric unit from July 24th through August 27, 2014.  He was diagnosed with major depression with suicidal ideation and cocaine dependence with overdose (1F/63-76 [(Tr. 381-94)]).

On March 16, 2015, [H]awkins was treated at the hospital with sudden onset of right facial droop and right arm weakness.  A CAT scan and CTA scan were unremarkable.  A toxicology screen was normal.  Upon further evaluation, [Hawkins] was diagnosed with possible transient ischemic attack, elevated troponin, headache and hypertension.  The treating physician noted, "My impression of the patient is that it is unlikely he is having a stroke.  However, if yes, he has at this point rapidly resolving neurological deficits with only minimal non-disabling deficit present on current examination …."  [Hawkins] was discharged after one night in the hospital.  (1F/6-62 [(Tr. 324-80)]).

. . . Since 2015, [Hawkins] received mental health services through Community Support Services.  He took multiple prescribed medications.  (3F/12 [(Tr. 511)])[.]  Medicine caused "some sedation"[] but no other side effects.  (2F/5 [(Tr. 484)])[.]  His GAF score was 55 in July 2015 and August 2015, consistent with moderate symptoms overall.  (2F/3, 11 [(Tr. 482, 490)])[.]  [Hawkins] agreed to restart counseling by October 2015.  (3F/25 [(Tr. 524)])[.]  In November 2015, [Hawkins] applied for a job.  He was not hired because he missed a drug screen, which made him irritable.  Insight and judgment were poor.  (3F/21 [(Tr. 520)])[.]  [Hawkins] had suicidal thoughts and hypoactive activity levels in early December 2015, prompting a change in medications.  (3F/17 [(Tr. 516)])[.]  Later that month, Robert Herman[]owski, M.D. noted that [Hawkins] was sleeping and eating better with Remeron and Wellbutrin.  [Hawkins] was still depressed, but suicidal ideation resolved.  A mental status exam was normal except for moderate depression, moderate anhedonia and mild anxiety.  [Hawkins] was encouraged to continue medications.  (3F/13-14 [(Tr. 512-13)]).

In January 2016, Dr. Herman[]owski noted "clear improvement" in [Hawkins's] mood.  Depression was better, energy improved and there was no suicidal ideation.  [Hawkins] tolerated medications well with no side effects.  [Hawkins] agreed to restart counseling and meet with a job developer.  Depression and anhedonia were mild.  There was no anxiety.  Mental status exam was otherwise normal.  (4F/1-2 [(Tr. 533-34)])[.]

[Hawkins] was hospitalized from February 13-16, 2016.  He was diagnosed with acute drug overdose, likely cocaine, suicide attempt myocardial infarction, acute major depression; depression; and stage II diastolic dysfunction (6F/1-4 [(Tr. 554-57)], 6F/13-79 [(Tr. 566-632)])[.]  Once [Hawkins] was stabilized, he was transferred to the psychiatric unit on February 16, 2016.  He was diagnosed with depressive disorder, cocaine dependence and drug abuse.  His Global Assessment of Functioning (GAF) scores ranged from 20 at admission and 40 at discharge.  (6F/9-10 [(Tr. 562-63)])[.]

[Hawkins] began to work a part-time cleaning job in March 2016.  Despite adding in work, he felt "okay."  (8F/17 [(Tr. 670)])[.]  In April 2016, [Hawkins] was "overall doing better."  There was no suicidal ideation.  [Hawkins] had agoraphobic anxiety at times, leading to the use of Vistaril as needed and suggestions for group therapy.  (7F/1 [(Tr. 633)])[.]  [Hawkins] had a panic attack in a crowded waiting room in May 2016.  He worked part-time (8F/7 [(Tr. 660)])[.]  July 2016 records indicated [Hawkins] was "feeling fairly good- mood is stable- a little anxious at times, but overall much improved on the medications."  There were no side effects.  [Hawkins] worked 15 hours per week, and felt good about it.  (8F/2 [(Tr. 655)])[.]

There was a gap in mental health treatment from July 2016 until February 2017.  In February 2017, [Hawkins] met with nurse practitioner Jamie Hain at Community Support Services.  He reported anxiety and discomfort around other people, depression and poor sleep.  [Hawkins] lived alone since April 2016.  He was able to perform his daily activities independently.  Symptoms were rated as moderate.  Aside from restricted affect, mental status exam was normal.  (9F/1 [(Tr. 681)])[.]  There were no further treatment sessions until May 2017.  [Hawkins] reported he felt mildly depressed, anxious and agitated.  Sleep was okay.  Mental status exam was normal.  (10F/1-3 [(Tr. 689-9)])[.]  There was another gap in treatment sessions from May until November 2017.  [Hawkins] "requested a same day appointment … in order that his disability papers be completed."  [Hawkins] denied any depression, anxiety, agitation or irritability.  He denied suicidal ideation.  Nurse Hain noted that [Hawkins] "repor[ted] that his current medications [were] effectively managing his psychiatric symptoms and he would like to continue with same."  (11F/1, 6 [(Tr. 708, 713)]).

(Tr. 34-36).

C.      **Relevant Opinion Evidence**

1.      **Physical Impairments**

On February 7, 2016, state agency consultant William Bolz, MD, evaluated Hawkins's physical capacity based on a review of the medical record and determined that Hawkins had the physical residual functional capacity ("RFC") to perform medium work.  (Tr. 98-100, 102). Specifically, Dr. Bolz stated that Hawkins could occasionally lift/carry 50 lbs.; frequently lift/carry 25 lbs.; stand/walk/sit for about 6 hours in an 8-hour workday; and push/pull with no limitations other than those for lifting/carrying.  (Tr. 98-99).  Dr. Bolz found that Hawkins had postural limitations based on Hawkins's high blood pressure, in that Hawkins could: frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; never climb ladders/rope/scaffolds; and balance without limits.  (Tr. 99).  Dr. Bolz further stated that Hawkins had no manipulative, visual, or communicative limitations.  (*Id.*).  Aside from the need to avoid concentrated exposure to hazards, Dr. Bolz did not assign any environmental limitations.  (Tr. 99-100).  On July 14, 2016, James Cacchillo, D.O., concurred with the physical functional assessments in Dr. Bolz's opinion.  (Tr. 115-17, 120).

2.      **Mental Impairments**

a.      **Treating Psychiatrist – Robert Hermanowski, MD**

On January 29, 2016, Dr. Hermanowski prepared a "Mental Status Questionnaire."  (Tr. 542-44).  He indicated that he treated Hawkins from July 31, 2015 to January 29, 2016.  (Tr. 542).  Dr. Hermanowski stated that Hawkins had: (1) appropriate appearance; (2) depressed mood and constricted affect; (3) moderate anxiety; (4) no thinking disorders; (5) intact orientation; (6) moderately impaired concentration; (7) average intelligence and fund of information; (8) fair memory and ability to understand and follow instructions; (9) fair ability to

6

maintain attention; (10) poor ability to sustain concentration, persist at tasks, and complete them

in a timely fashion; and (11) no deficiencies in his social interaction and adaption.  (Tr. 542-43).

Dr. Hermanowski noted Hawkins's drug use and criminal history in discussing his

insight/judgment.  (Tr. 542).  Dr. Hermanowski stated that Hawkins had a single, ongoing

diagnosis for major depression and had ongoing treatment for hypertension.  (Tr. 543).  He

opined that Hawkins could not manage any benefits that might be due and would react "ok" to

the pressures involved in simple and routine, or repetitive tasks.  (*Id.*).

### 3.    Treating Social Worker – Lisa Lesneski, LSW

On January 6, 2016, Lisa Lesneski, LSW – a licensed social worker – prepared an

"Observational Statement from Case Manager or Outreach/Shelter Worker."  (Tr. 551-52); *see*

(Tr. 256 (providing Lesneski's title)).  Lesneski check marked several boxes on the document,

indicating that Hawkins had: (1) poor concentration, persistence, judgment, and memory; (2) less

than adequate social interactions; (3) adequate reliability; and (4) good cooperation, hygiene,

interactions with authority, and ability to follow simple instructions and program rules.  (Tr.

551).  For those items she checked "poor," Lesneski explained, "Client presents with depressed

mood, lack of motivation, continued isolation however is very cooperative with accepting

treatment."  (*Id.*).

On January 11, 2016,[4] Lesneski prepared a "Function Report."  (Tr. 256-63).  She

indicated that she had known Hawkins for one year; her office was on the first floor of

Hawkins's apartment building; she met with him monthly for scheduled appointments; and

would briefly encounter him throughout the month.  (Tr. 256).  Hawkins lived in "Independent

---

[4] The record is ambiguous about when Lesneski's function report was completed.  At the beginning of the
report, she stated that the date was January 11, 2016.  (Tr. 256).  Towards the end, however, she said the
date was January 29, 2016.  (Tr. 263).  The court uses the former but notes that the actual date is
immaterial to the court's decision.

Supportive Housing." (*Id.*).  Hawkins's depression interfered with Hawkins's daily activities due to a lack of motivation and suicidal thoughts.  (*Id.*).

Lesneski also noted that Hawkins reported: spending most of his time watching television; his depression resulted in the loss of employment; and he had daily nightmares and off and on periods of too much/inability to sleep.  (Tr. 257).  Hawkins had no problems with personal care; didn't need any special reminders to groom and take medicine; could and did cook and prepare meals daily; and had no issues with household chores or completing tasks.  (Tr. 257-58).  But he needed encouragement to help with motivation.  (Tr. 258).  Hawkins went outside several times per week and could do so alone and travel by foot, car, or public transportation.  (Tr. 259).  He also went out for groceries up to two times per month and – according to Hawkins's self-reports – was able to pay bills, count change, handle a savings account, and use a checkbook.  (*Id.*).  He reported no issues walking, following spoken instructions, or getting along with authority figures and had an average attention span, which was sometimes interfered with by his depression.  (Tr. 261-62).  However, he indicated that he had difficulties get along with supervisors in the past.  (Tr. 262).

Lesneski stated that Hawkins reported that his depression interfered with his ability/motivation to participate in any activities.  (Tr. 260).  Hawkins spent minimal time interacting with others in his apartment complex, and he indicated that he spent most of his time inside watching television.  (*Id.*).  He needed reminders of scheduled appointments because he reported having difficulty remembering/concentrating and motivation to follow up with appointments.  (*Id.*).  Hawkins also didn't feel comfortable being around others and has been in isolation since his condition began.  (Tr. 261).

Lesneski opined that Hawkins's condition affected his memory, ability to complete tasks, concentration, and ability to get along with others.  (*Id.*).  He did not handle stress well, though he had no issues in handling changes to routine.  (Tr. 262).  Lesneski noted unusual behavior, namely "[f]lat affect, lack of motivation, suicidal thoughts at times, severe depression."  (*Id.*).  In her closing remarks, Lesneski stated: "[Hawkins] has presented with flat affect, suicidal thoughts, depressive symptoms and behaviors.  Client has made attempts to work with our vocational department, however mental health status/depression interferes with his motivation."  (Tr. 263).

### 4.      Treating Nurse Practitioner – Jamie Hain, CNP.

On November 29, 2017, Jamie Hain, CNP, completed a form "Medical Source Assessment (Mental)."  (Tr. 717-19).  The form asked Hain to rate certain tasks or functions on a "1" to "5" scale, with one indicating no observable limits and "5" indicating an inability to perform/function.  (Tr. 717).  Hain checked marked "5" in relation to Hawkins's ability to travel in unfamiliar places or use public transportation.  (Tr. 718).  She marked "3" and "5" in relation to Hawkins's ability to sustain an ordinary routine without special supervision.  (Tr. 717).  Hain marked "4" in relation to Hawkins's ability to: understand and remember detailed instructions; maintain attention and concentration for extended periods of time; make simple work-related decisions; complete a normal workday/workweek without interruptions from his symptoms and perform at a consistence pace without unreasonable rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 717-18).  Hain marked "3" and "4" in relation

to Hawkins's ability to carry out detailed instructions.  (Tr. 717).  And she marked "2" in relation to Hawkins's ability to: carry out very short and simple instructions; perform activities within a schedule.  (*Id.*).

Hain opined that Hawkins would be absent about four days per month and would expect Hawkins to be off-task 10% of the time due to his mental health symptoms.  (Tr. 718).  She expected that he would need two unscheduled 15- to 20-minute breaks – beyond a lunch break and two short breaks – if he were working a full-time, low stress job.  (*Id.*).  Hain left blank the portion of the form asking what medical findings supported her conclusion.  (Tr. 718-19).  In a portion asking for any additional relevant information, Hain stated, "Mr. Hawkins's psychiatric symptoms are managed by psychiatric medications while residing in a structured residential environment."  (Tr. 719).  The form was co-signed by E. Schwartz, M.D., though his signature was dated November 30, 2017.  (*Id.*).

### 5.    Third-Party Statement – Cheryl Vincent, BS

On January 22, 2018, Cheryl Vincent wrote that she was Hawkins's case manager for Community Support Services ("CSS").  (Tr. 305).  She provided Hawkins case management services on a weekly basis.  (*Id.*).  Vincent stated that Hawkins needed frequent reminders for his CCS psychiatry and primary care appointments, monthly grocery shopping assistance, frequent guidance and direction during document completion, prompting, and continued case management services.  (*Id.*).  He also required assistance with housing recertification and food and medical benefit renewals with the Ohio Department of Job and Family Services.  (*Id.*).

### 6.    State Agency Consultants

On February 5, 2016, Robyn Murry-Hoffman, Ph.D., evaluated Hawkins's mental capacity based on a review of the medical record.  (Tr. 96-97, 100-01).  Dr. Murry-Hoffman

found no understanding and memory, social interaction, or adaptation limitations.  (Tr. 100-01).

She did find sustained concentration and persistence limitations, in that Hawkins was moderately

limited in his ability to: (1) carry out detailed instructions; (2) maintain attention and

concentration for extended periods; and (3) perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances.  (*Id.*).  Dr. Murry-Hoffman found no

significant limitation in Hawkins's ability to sustain an ordinary routine without special

supervision; work in coordination or in proximity to others without being distracted; make

simple work-related decisions; carry out very short and simple instructions; or complete a normal

workday/workweek without interruptions and perform at a consistent pace without unreasonable

rest periods.  (*Id.*).  She stated, however, that Hawkins might need more frequent breaks to assist

in better focus when on task and that his motivation issues could impact attendance.  (Tr. 101).

### D.  Relevant Testimonial Evidence

#### 1.  Hawkins's Testimony

Hawkins testified at the January 26, 2018 ALJ hearing.  (Tr. 53-81).  His anxiety made

him too nervous to drive and was triggered by being around lots of people, so he also could not

take public transportation.  (Tr. 54).  He relied on his caseworker to take him anywhere and

everywhere he needed to go.  (*Id.*).  The last time he worked was in 2017, when he worked part-

time (ten hours/week) for nine months cleaning a building at night.  (Tr. 54-55).  Hawkins

stopped working because he couldn't remember the things and places he was supposed to clean.

(Tr. 55-56).  The reason he was unable to work was because of his anxiety.  (Tr. 61-62).  When

other people were around, his heart would beat really fast and he would start sweating and

hyperventilating.  (Tr. 62).  He'd had this problem for four years.  (Tr. 62-63).  His depression

affected his ability to work in that he could not bring himself to do anything or go anywhere.

(Tr. 64).  He treated both his anxiety and depression with medication, and the medication for depression have him some energy.  (Tr. 62, 65-66).

Hawkins stated that he also could not work due to an incident in November 2017 in which a person fell on Hawkins's leg and hyperextended his right knee.  (Tr. 66).  He went to the emergency room and received crutches and a brace, but he had not been able to get a follow-up appointment.  (Tr. 66-67).  He was limited in the degree to which he could walk because he could not fully bend his leg.  (Tr. 68).  He had initially been prescribed Percocet, but he was not taking anything anymore.  (*Id.*).

Hawkins testified that he had chronic high blood pressure, which prevented him from exerting himself too much.  (Tr. 68-69).  When cleaning floors, he had to stop moping after ten minutes.  (Tr. 69).  He was supposed to spend most of the time that he was cleaning standing/walking, but he would lose focus and start watching television.  (Tr. 69-70).

As for his activities of daily living, Hawkins stated that he did not leave his apartment much and he had no issues with self-care.  (Tr. 75).  He had no difficulty preparing food, but he would sometimes stop eating for lack of motivation and his caseworker would check in on him. (Tr. 75-76).  He noted that he lived in a building for the chronically homeless and disabled in which the caseworkers were on the first floor.  (Tr. 76).  Recently, the case worker had to check in on him after he had been locked inside for a day or two.  (*Id.*).  Hawkins didn't have issues cleaning, except when he got real down – a couple times per month – when he would stop doing it all together.  (Tr. 76-77).  His caseworker took him grocery shopping one per month and made sure he ate nutritious food.  (Tr. 77-78).  The caseworker also helped him check out.  (*Id.*). Hawkins explained that what changed from 2016 was that he got a new caseworker, one that would not allow him to just buy junk food.  (Tr. 78-79).

12

## 2.    Vocational Expert ("VE") Testimony

Daniel Simone, a VE, also testified at the ALJ hearing.  (Tr. 82-90).  The ALJ asked the VE whether an individual with Hawkins's age, education, and work experience could work if he were limited to medium work, except: no ladders, ramps, or stairs; no concentrated exposure to workplace hazards, such as heights and moving mechanical parts; no commercial driving; he could adapt to changes so long as they were clearly defined prior to implementation and implemented gradually; occasional and superficial interactions with supervisors and coworkers; no tandem or group tasks or tasks requiring direct collaborative efforts with others.  (Tr. 83-84).  The VE testified that such an individual could perform Hawkins's past work as a linen room attendant as typically performed.  (Tr. 84).  That individual could also work as a hand packager, dining room attendant, and hospital cleaner.  (Tr. 84-85).

The VE further testified that if the hypothetical person were restricted to light work, he would still be able to work as a linen room attendant but not as Hawkins typically performed the job.  (Tr. 85).  If the individual were further restricted to work in a nonpublic setting with no proximity to large groups of people, occasional exposure to members of the public, and no interactions with the public as part of job duties, the VE testified that the answer depends.  (Tr. 85-86).  If nonpublic meant occasional exposure to members of the public with no interaction as part of the individual's job duties, then the hypothetical individual could work as a linen room attendant.  (Tr.85-87).  If it meant that the individual could not even be exposed to members of the public, then the individual could not.  (Tr. 87).  But the individual could still work as a hand packager and hospital cleaner, as well as window cleaner.  (Tr. 87-88).

The VE testified that an employer would tolerate an employee to be off task less than 15% of the time.  (Tr. 88).  An employer would tolerate one absence er month, but any more on a

regular basis would be job prohibitive.  (Tr. 88-89).  After the ALJ finished questioning the VE,

Hawkins's counsel indicated that she had no questions to ask.  (Tr. 89).

## III.    The ALJ's Decision

On February 8, 2018, the ALJ issued a written decision denying Hawkins's claim.  (Tr.

29-40).  The ALJ made the following paraphrased findings relevant to Hawkins's arguments in

this case:

> 4.   Hawkins had the RFC to perform medium work except he: can never climb
> ladders, ramps or stairs; can frequently stoop, kneel, crouch, or crawl; must avoid
> concentrated exposure to workplace hazards such as unprotected heights and
> moving mechanical parts; cannot perform any commercial driving; can
> understand, remember, and carry out simple instructions and perform simple
> routine tasks; can adapt to changes in the work setting so long as the changes are
> clearly defined prior to implementation and implemented gradually; can interact
> occasionally and superficially with supervisors and coworkers, but he cannot
> perform tandem or group tasks, or other tasks requiring direct collaborative efforts
> with others for completion; must work in a nonpublic setting – meaning he can
> occasionally be exposed to members of the public but never interact with them as
> part of his job duties; and cannot work in proximity to large groups of people.
> (Tr. 32-33).
>
> . . . Some weight was afforded to Dr. Hermanowski's mental status questionnaire
> "because the moderate limitations are supported by the ongoing symptoms with
> relatively normal mental status exams.  Controlling weight is not afforded,
> because newer evidence also suggests social limitations and anxiety in crowds.
> Poor ability to complete tasks is contradicted by the claimant's ability to live
> independently and his part-time work after the alleged onset date.  Further, there
> was a short treatment history at the time of this assessment."  (Tr. 36).
>
> . . . Lesneski's January 6, 2016 assessment was not given controlling weight
> "because it was based on a short treatment history (5 months) and social workers
> are not acceptable medical sources.  Poor concentration, focus and persistence,
> judgment and memory are inconsistent with the good response to treatment with
> minimal side effects, the relatively normal mental status exams after treatment
> began, and the claimant's daily activities including caring for himself, living
> alone and working part-time."  (Tr. 36-37).
>
> Hain's and Dr. Schwartz's co-signed medical source opinion was not given
> controlling weight "because the extreme limitation are inconsistent with the good
> response to treatment, the lack of significant side effects, the relatively normal
> mental status exams since the claimant began treatment, and the infrequent

14

treatment sessions in 2017.  Further, [Hawkins's] ability to live alone and work part-time contradict the degree of limitations proposed.  Additionally, Dr. Herman[]owski provided most of [Hawkins's] treatment.  There are no records of treatment sessions with Dr. Schwartz.  Nurse Hain first treated [Hawkins] in February 2017, with infrequent visits in 2017.  In the same month when this assessment was completed, Nurse Hain noted, 'current medications [were] effectively managing his psychiatric symptoms and he would like to continue with same,' (11F/6 [(Tr. 713)]) which is inconsistent with the level of limitations reported.  For these reasons, the undersigned gives little weight to the opinions of Nurse Hain and Dr. Schwartz."  (Tr. 37).

Vincent's January 2018 statement not given controlling weight "because caseworkers are not acceptable medical sources.  Further, no specific work related limitations were offered.  The undersigned affords some weight because Ms. Vincent observes [Hawkins] on a frequent basis.  Her reports of assistance with paperwork are consistent with the fact that she assisted [Hawkins] with Social Security paperwork.  The need for assistance in this regard supports the need to limit [Hawkins] to simple routine instructions and simple routine tasks."  (Tr. 37-38).

The state agency medical consultants' physical RFC assessments were given great weight "because they are consistent with the positive objective findings, and the lack of any ongoing care or clinical abnormalities for physical concerns and the lack of ongoing clinical abnormalities.  This opinion is consistent with the work after the alleged onset date as a part-time cleaner.  Further, no treating source offered limitations greater than these consultants suggest."  (Tr. 38).

The state agency psychological consultants' mental RFC assessments were afforded some weight.  "The undersigned does not find that [Hawkins] needs additional breaks, because the relatively normal mental status exams, work after onset and the good response to treatment contradict the need for this accommodation.  The remainder of the opinion is supported by improvements with medication and daily activities such as working and living independently." (*Id.*).

5.  Based on the VE's testimony that someone with Hawkins's RFC, age, education, and work experience could perform the requirements of a linen room attendant, Hawkins is able to perform past relevant work.[5]  (Tr. 38-39).

Alternatively, there were jobs that existed in significant numbers in the national economy that Hawkins could perform, such as hand packager, window cleaner, and hospital cleaner.  (Tr. 39-40).

---

[5] After finding the VE credible, the ALJ wrote that Hawkins was "unable" to perform past relevant work. (Tr. 39).  But this appears to be a typo given that the ALJ had credited the ALJ's testimony to the contrary and stated in the next paragraph that Hawkins "is capable of performing past relevant work."  (*Id.*).

Based on these findings, the ALJ determined that Hawkins was not disabled and denied his claim.  (Tr. 40).

## IV.    Appeals Council Proceedings

On August 13, 2019, the Appeals Council denied review of the ALJ's decision.  (Tr. 13). On September 25, 2019, the Appeals Council set aside that decision per Hawkins's request to submit additional information.  (Tr. 11).

On October 21, 2019, Hawkins wrote to the Appeals Council that he had been undergoing neurological assessment.  (Tr. 312).  He indicated that he was transmitting a neurological evaluation that he underwent on "June 17, 2017," showing that he "has a traumatic subdural hematoma without loss of consciousness, subsequent encounter and intracranial hemorrhage (HCC)."  (*Id.*).  Hawkins argued that the medical record was underdeveloped as to this condition.  (*Id.*).

Hawkins attached to his letter an "After Visit Summary" from the Cleveland Clinic dated "6/17/2019."  (Tr. 316).  The summary indicated that he had seen Yonatan Spolter, MD, on "June 1, 2019" for "New Patient" and Dr. Spolter addressed "Traumatic subdural hematoma without loss of consciousness, subsequent encounter and intracranial hemorrhage."  (*Id.*). Dr. Spolter ordered a CT brain scan but no follow up appointment was scheduled.  (Tr. 316-17). The summary contained a "Problem List," listing "None."  (Tr. 317).

On April 14, 2020, the Appeals Council denied review of the ALJ's decision.  (Tr. 1).  It indicated that it received Dr. Spolter's treatment notes, but found that the evidence did not relate to the relevant period – through February 8, 2018 – such that the new evidence did not affect the decision about whether he was disabled beginning on or before that date.  (Tr. 2).

V.     **Law & Analysis**

A.     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

17

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step

Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.  Step Four – Weighing of Treating Source Opinion Evidence[6]

Hawkins argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in evaluating the opinion evidence.  ECF Doc. 16 at 7.  He contends that the ALJ failed to apply proper legal standards by not properly applying the "treating physician rule" because the ALJ never examined whether Hawkins's treating source opinions were well supported by medically acceptable clinical techniques.  ECF Doc. 16 at 7-8.  Hawkins argues that the ALJ, instead, erroneously collapsed the treating source analysis into one step, contrary to *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).  ECF Doc. 16 at 9.

Hawkins next contends that the ALJ improperly discounted the opinions of "Lisa Lesneski, *Ph.D, RN*" as an unacceptable medical source because she was a "Ph.D." specialist.  ECF Doc. 16 at 9-10 (emphasis added).  He claims that her opinion was also improperly discounted for lack of extensive treatment records because Lesneski treated Hawkins at CSS and had extensive knowledge of Hawkins's medical records from other mental health professionals who treated him.  ECF Doc. 16 at 10.  Thus, Hawkins contends that the ALJ's rejection of Lesneski's opinion was "factually and legally" wrong.  ECF Doc. 16 at 10-11.  He also argues that the ALJ ignored Lesneski's January 11, 2016 function report without explanation.  ECF Doc. 16 at 13-14.  Specifically, her statement that Hawkins presented with a flat affect, suicidal thoughts, depressive symptoms, and behaviors.  ECF Doc. 16 at 13.

---

[6] Hawkins lists in his brief seven issues that he seeks raise.  Those issues have been consolidated, reorganized, and restated for ease of analysis.

Hawkins continues that the ALJ failed to give a sufficient explanation for giving Dr. Hermanowski's opinion "little weight" because the ALJ never defined what she meant by "little weight," specify what symptoms supported her opinion, and ignored abnormal mental status exam findings, such as Lesneski's January 26, 2016 opinion that Hawkins had flat affect, suicidal thoughts, and depressive symptoms and behaviors.  ECF Doc. 16 at 14 (citing (Tr. 262)). Hawkins asserts that the ALJ made the same errors in evaluating Hain's and Dr. Schwartz's opinion.  ECF Doc. 16 at 14-15.  Specifically, Hawkins contends that the ALJ gave no valid reasons for "ignoring" their opinion – which was similar to that of Dr. Hermanowski's.  ECF Doc. 16 at 12.  Hawkins emphasizes Hain's and Dr. Schwartz's statement that his psychiatric symptoms were managed by medication while residing in a structured environment because, if he had been living independently, the medications would not have managed symptoms.  Id.

The Commissioner disagrees with each of Hawkins's arguments.  ECF Doc. 18 at 5-10.

Hawkins's replies, reiterating that the ALJ ignored the treating physician rule; the ALJ never defined or explained what "some weight" meant, cited his symptoms, or referred to his abnormal mental status exams in discounting Dr. Hermanowski's opinion.  ECF Doc. 19 at 1-2. He argues that the ALJ gave "weak reasons" for ignoring Lesneski's – who he again describes as a "Ph.D. RN" – statement that in 2014 Hawkins stopped working due to difficulties managing his illness, had not been able to obtain employment while dealing with severe depression, and found it hard to deal with daily living activities.  ECF Doc. 19 at 3 (citing Tr. 226)).

### 1.    Medical Opinion Standard

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 404.1527(c).  An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and

laboratory diagnostic techniques"; or (2) inconsistent with findings in the treating source's own records or other medical evidence in the case record. 20 C.F.R. § 404.1527(c)(2); *Biestek*, 880 F.3d at 786. And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, she must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that decision. *See Gayheart*, 710 F.3d at 376; *Biestek*, 880 F.3d at 786.

If an ALJ does not give a treating physician's opinion controlling weight, she must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)–(6). The ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). Nevertheless, nothing in the regulations requires the ALJ to explain how she considered each of the factors. *See* 20 C.F.R. § 404.1527(c); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations' procedural safeguard by stating good reasons for the weight given to the treating source's opinion). Further, nothing in the regulations requires the ALJ to bifurcate her controlling weight and non-controlling weight analyses. *Cf. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (holding that an ALJ's one-sentence rejection of a treating physician's opinion satisfied section 404.1527(d)(2)'s "good

21

reasons" requirement); *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well supported by the overall evidence of record and are inconsistent with other medical evidence of record.'  This is a specific reason for not affording controlling weight to Dr. Lin.").

### 2. Dr. Hermanowski

The ALJ applied proper legal standards in weighing Dr. Hermanowski's opinion. Hawkins is correct that the ALJ failed to strictly follow the two-step analytical framework for treating physicians.  In *Gayheart*, the Sixth Circuit emphasized the distinction, stating that an ALJ could properly consider the 20 C.F.R. § 404.1527(c)(2) factors only after stating that the treating physician's opinion was not due controlling weight and giving good reasons therefor. 710 F.3d at 376.  In Hawkins's case, the ALJ appeared to have blended the analysis by not evaluating why controlling weight was not warranted before assigning "some weight" to Dr. Hermanowski's opinion or clearly distinguishing her reasons why his opinion was not due controlling weight with her reasons why his opinion was entitled only to "some weight."  (Tr. 36).

Reversal on that basis, however, is not warranted.  "[C]ourts are increasingly less strict in demanding two clearly separate analyses in cases of treating source opinions, but have been satisfied when the ultimate decision as to weight, regardless of the precision of its formation, considers the *Gayheart* factors and is supported by good reasons."  *Swartz v. Comm'r of Soc. Sec.*, No. 5:14-cv-2723, 2016 U.S. Dist. LEXIS 15706, at *18 (N.D. Ohio Feb. 9, 2016) (citation omitted).  The ALJ complied with the regulations by evaluating all the opinion evidence in light of the entire medical record and clearly stating the weight given to each medical opinion. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. § 404.1527(c); (Tr. 36-38).

Although Hawkins faults the ALJ for not defining the terms the she utilized to describe the weight assigned to each opinion, she didn't need to.  As our sister court has recognized:

> The terms "significant weight," "some weight," and "little weight" are commonly used by ALJs in disability decisions when weighing medical opinions.  This District has previously recognized that when an ALJ gives "significant weight" to a medical opinion, that means it is given more than "some weight" or "little weight."  Likewise, assigning "some weight" to a medical opinion indicates that the ALJ is giving it more than a "little weight."  . . . Thus, the ALJ's opinion sufficiently details that he has given more weight to the opinions of the state agency reviewing physicians by giving them "some weight," than to the opinions of plaintiff's treating and examining physicians, on which he placed "little" or "no weight."

*Farris v. Comm'r of Soc. Sec.*, No. 1:11-cv-258, 2012 U.S. Dist. LEXIS 60247, at *22-23 (S.D. Ohio Apr. 30, 2012) (citations omitted).

The ALJ also articulated good reasons for giving Dr. Hermanowski's opinion less than controlling weight when she explained that: (1) newer evidence suggested social limitations and anxiety in crowds; (2) his opinion that Hawkins had poor ability to complete tasks was contradicted by Hawkins's ability to live independently and part-time work; and (3) there was a short treatment history at the time of his assessment.  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. § 404.1527(c); (Tr. 36).  The regulations did not require the ALJ to give a lengthy discussion regarding her reasons, explicitly discuss each factor, or bifurcate her controlling weight and noncontrolling weight analyses, as her discussion was sufficient to explain the reasons she gave Dr. Hermanowski's opinion "some weight."  *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; *Francis*, 414 F. App'x at 804–05; *Allen*, 561 F.3d at 651; *Bledsoe*, 165 F. App'x at 412.  Nor was the ALJ required to discuss all the evidence.  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 730 (6th Cir. 2013).

Substantial evidence also supported the ALJ's reasons for discounting Dr. Hermanowski's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Such evidence

23

includes: (1) Dr. Hermanowski's post-opinion treatment notes, stating that Hawkins had agoraphobic anxiety at times, a panic attack in the waiting room, began working part-time, and worked 15 hours per week and felt good about it; (2) the existence of treatment notes for only five meetings with Dr. Hermanowski prior to his opinion; (3) Hain's February 8, 2017, treatment notes stating that Hawkins reported discomfort and anxiety around other people; (4) Hawkins's reported daily activities around the time of Dr. Hermanowski's opinion that he could manage his personal care, prepare meals, do chores, shop, handle and manage money, finish tasks, and get around without assistance; (5) Hawkins's consistent testimony that he had no difficulties with self-care or preparing food, could ride with his caseworker to buy groceries, and could do household chores except maybe twice a month; and (6) Lesneski's January 11, 2016 statement that Hawkins had no issues completing tasks.  (Tr. 54, 75-77, 245-48, 480-91, 533-40, 547-49, 633, 655, 660, 670, 681).

Because the ALJ adequately explained the weight he assigned to Dr. Hermanowski's opinion and because his findings that newer evidence suggested social limitation and anxiety, Dr. Hermanowski's opinion that Hawkins had a poor ability to complete tasks was contradicted by Hawkins's daily activities and part-time work, and he had only a short treatment history at the time of the opinion were reasonably drawn from the record, the ALJ's decision to give his opinion "some weight" fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d a 877.

### 3.    CNP Hain and Dr. Schwartz

The ALJ applied proper legal standards in evaluating Hain's and Dr. Schwartz's joint opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The court agrees with Hawkins that the

ALJ improperly applied the treating physician rule to their opinion but doesn't agree with Hawkins on why.

The ALJ felt it necessary to explain why Hain and Dr. Schwartz's opinion was not given controlling weight.  That would have been warranted if they were treating sources.  20 C.F.R. § 404.1527(c)(2).  But they weren't.  A treating source is an acceptable medical source who provides or has provided medical treatment/evaluation or has an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1527(a)(2).  Although Dr. Schwartz co-signed Hain's medical source statement, his name appears nowhere in any of Hawkins's treatment records.  (Tr. 719); *see generally* (Tr. 319-478, 480-98, 533-40, 554-631, 633- 52, 653-79, 690-714).  Thus, Dr. Schwartz wasn't a treating source.  Neither was Hain.  She was a certified nurse practitioner.  (Tr. 719).  And nurse practitioners were not considered acceptable medical sources under the regulations applicable to Hawkins's application.[7]  *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248 (6th Cir. 2015); 20 C.F.R. § 1502.1513(d)(1) (2016).  Therefore, Hain's and Dr. Schwartz's opinions were not due controlling weight and the ALJ was not required to give good reasons for discounting them.  *Smith*, 482 F.3d at 876; 20 C.F.R. § 1527(c)(2).

Nevertheless, the treating physician rule incorporates the lesser standards for non-treating physicians and other source opinions, and the ALJ properly conducted this analysis after determining that Hain's and Dr. Schwartz's opinion was not entitled to controlling weight.  *Bowen*, 478 F.3d at 746; *compare Gayheart*, 710 F.3d at 376, *with* 20 C.F.R. § 404.1527(c), *and*

---

[7] On January 18, 2017, the Social Security Administration amended the rules for evaluating opinion evidence for claims filed on or after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The post-March 27, 2017, regulations classify licensed advanced practice registered nurses as acceptable medical sources.  20 C.F.R. § 404.1502(a)(8).  But because Hawkins filed his application on December 7, 2015, that regulation doesn't apply.  (Tr. 189).

06-3p SSR, 2006 SSR LEXIS 5 *11 (2006) (the same factors applicable to opinions from non-treating physicians apply to opinions from non-acceptable medical sources).

The ALJ complied with the regulations when he explained that he gave Hain's and Dr. Schwartz's opinion "little weight" because: (1) the extreme limitations contained in their opinion were inconsistent with Hawkins's good response to treatment, the lack of significant side effects, the relatively normal mental status exams since beginning treatment, Hain's contemporaneous treatment notes, and Hawkins's ability to live alone and work part-time; (2) Dr. Hermanowski provided most of Hawkins's treatment at the time of the opinion; (3) there were no treatment records from Dr. Schwartz; and (4) Hain began treating Hawkins in February 2017, with infrequent visits.  (Tr. 37).  20 C.F.R. § 404.1527(c).  That explanation was consistent with the regulatory factors and sufficient for a reviewing court to track the ALJ's reasoning for discounting Hain's and Dr. Schwartz's opinion.  *Id.*; *Stacy*, 451 F. App'x at 519.

Substantial evidence also supported the ALJ's reasons for giving Hain's and Dr. Schwartz's opinion "little weight."  Such evidence includes: (1) Hain's mental status evaluations through November 29, 2017 showing no more than restricted affect and a reduction from moderate to none in his depression, anhedonia, and anxiety; (2) Hawkins's statements to Hain on November 29, 2017 denying *any* mental health symptoms (including depression and anxiety) and claiming that his medication was effectively managing his symptoms; (3) Hain's February 8, 2017 treatment notes indicating that Hawkins reported "medication adherence without adverse effects" and that he tended to his activities of daily living "independently;" (4) Hawkins's testimony that he had worked part-time for nine months the year the opinion was prepared; (5) Hawkins's testimony regarding his activities of daily living; and (6) the existence

of treatment notes for only three meetings between Hawkins and Hain at the time of her opinion. (Tr. 54-55, 75-77, 681-82, 690-91, 696-97, 708-09, 713).

Moreover, although not cited by the ALJ as a basis for discounting Hain's and Dr. Schweitzer's opinion, the ALJ noted that their opinion consisted of check-mark responses with no explanation. (Tr. 37). That observation is correct. Hain's and Dr. Schwartz's opinion consisted of a check-box form in which they provided no explanation or cited medical findings to support their opinion. (Tr. 717-19). Their opinion would have been due "little weight" on that basis alone. *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) ("[An] administrative law judge properly g[i]ve[s] a chek-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence.").

Because the ALJ adequately explained the weight she assigned to Hain's and Dr. Schwartz's opinion and because her reasons for the weight given were reasonably drawn from the record, the ALJ's decision to give their opinion "little weight" fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d a 877.

### 4.    LSW Lesneski's January 6, 2016 Opinion

The ALJ also applied proper legal standards in evaluating Lesneski's January 6, 2016 opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Hawkins misstates the record. Lesneski was not a Ph.D. Nor was she a RN. She was a licensed social worker.[8] (Tr. 241, 251, 256, 550). She was therefore not an acceptable medical source under the regulations and, by extension, not a treating source. 20 C.F.R. §§ 404.1513(d), 404.1527(a)(2). And the ALJ was not required to

---

[8] It is theoretically possible that Lesneski had also earned a Ph.D. or held licensure as an R.N., but Hawkins has not cited any record that indicates as much.

provide "good reasons" for discounting the opinion. 20 C.F.R. § 404.1527(c)(2); *Smith*, 482 F.3d at 876.

All the ALJ was required to do was explain the weight given to Lesneski's opinion "or otherwise ensure that the discussion of the evidence in the determination . . . allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning." SSR 06-03p, 2006 SSR LEXIS 5 *15-16. She did exactly that. The ALJ didn't specify what weight she gave to Lesneski's January 6, 2016 opinion. (Tr. 37). But the ALJ stated enough to allow the court to track her reasoning by explaining that she gave Lesneski's opinion less than controlling weight because: (1) it was based on a short treatment history; and (2) Lesneski's findings of poor concentration, focus, persistence, judgment, and memory were inconsistent with: (a) Hawkins's good response to treatment with minimal side effects, (b) post-treatment normal mental status exams, and (c) Hawkins's daily activities. (*Id.*). That explanation tracked three of the relevant factors. SSR 06-03p, 2006 SSR LEXIS 5 *11. That was enough to allow the court to find that the ALJ considered the required factors. *Id.*; *see Francis*, 414 F. App'x at 804–05; *Tabor v. Comm'r of Soc. Sec.*, No. 1:16-cv-2971, 2018 U.S. Dist. LEXIS 44552, at *11-12 (N.D. Ohio Mar. 18, 2018) ("The ALJ is not required to perform an exhaustive factor-by-factor analysis in order to fulfill her obligation to consider other source opinions pursuant to the SSR."); *Snyder v. Comm'r of Soc. Sec.*, No. 1:15-cv-137, 2016 U.S. Dist. LEXIS 32038, at *29 (N.D. Ohio Mar. 14, 2016) (same).

The ALJ's reasons for discounting Lesneski's January 6, 2016 were also supported by substantial evidence. Specifically: (1) the fact that the earliest treatment records at CSS were from July 31, 2015 – five months before Lesneski issued her opinion; (2) Mental status exams from January 15, 2016 through November 29, 2017 showing normal cognition, judgement

28

thought process, and thought content; (3) Dr. Hermanowski's treatment notes from March 18, 2016 encounter indicating that Hawkins was tolerating medications well and treatment notes from July 22, 2016, indicating that Hawkins was "overall much improved on the meds;" (4) Hain's treatment notes from November 29, 2017, stating that Hawkins denied any mental health issues and stated that his medication was effectively managing his symptoms; (5) Hain's February 8, 2017 treatment notes indicating that Hawkins reported no adverse effects to medication or independent living; and (6) Hawkins's statements and testimony regarding his activities of daily living.  (Tr. 54, 75-77, 245-48, 633-34, 638-39, 643-44, 468-49, 488, 670, 676, 681-82, 691, 697, 703, 709, 713).

Because the ALJ provided sufficient explanation in her review of Lesneski's January 6, 2016 opinion for the court to follow the ALJ's reasoning and because the ALJ's reasons for discounting Lesneski's opinion were reasonably drawn from the record, the ALJ's decision to discount Lesneski's opinion fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d a 877.

### 5.    LSW Lesneski's January 11, 2016 Opinion

Hawkins is incorrect that the ALJ "ignored" Lesneski's January 11, 2016 report.  The ALJ explicitly cited it during her Step Three evaluation.  (Tr. 32 (citing Tr. 256-63)).  That being said, the ALJ never discussed Lesneski's findings, stated if her opinion was adopted or rejected, or gave an explanation for any weight that may have been given to that report.  *See generally* (Tr. 29-40).  The ALJ's omission could constitute a failure to consider all available evidence and a failure to explain the weight given to Lesneski's opinion or otherwise discuss the evidence in such a way to allow this court to evaluate how that opinion was considered.  20 C.F.R. § 404.1527(f); SSR 06-03p, 2006 SSR LEXIS 5 *8-9.  However, a remand on that basis is not

warranted.  *Carroll v. Astrue*, No. 1:09-cv-1232, 2010 U.S. Dist. LEXIS 65566, at \*29 (N.D. Ohio July 1, 2020) ("[T]here is no requirement to remand if there is no reason to believe that a different outcome could result had the 'other source's' opinion been assessed.") (citing *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004)).

The portions of Lesneski's January 11, 2016 report to which Hawkins directs the court's attention are: (1) her opinion that Hawkins's depression interfered with his motivation, concentration, and ability to interact with others, which she explained was the basis for her opinion that his condition affected his memory, concentration, ability to complete tasks, and understand and follow instructions; and (2) her observation that Hawkins "presented with a flat affect, suicidal thoughts, depressive symptoms and behaviors." ECF Doc. 16 at 13-14 (quoting (Tr. 261, 263)).  Lesneski's opinion regarding Hawkins's concentration, motivation, ability to socially interact, his memory, ability to follow instructions, and ability to complete tasks had already been stated – with more specificity as to their degree of limitation – in her January 6, 2016 opinion with the same explanation.  *Compare* (Tr. 261), *with* (Tr 554).  The ALJ carefully evaluated the January 6, 2016 opinion and rejected it – a determination that, as discussed above, was supported by substantial evidence.  There's no reason to think that the ALJ would have treated two nearly identical opinions by the same source given less than a week apart differently.  And Hawkins has not shown how the statement that he presented in January 2016 with flat affect, suicidal thoughts, and depressive symptoms and behaviors bears on his functional limitations or would change the ALJ's RFC assessment as of the time of the ALJ's decision, particularly in light of his subsequent improvement in each of these areas when he was treated with appropriate medication.  "Thus, remanding on this issue would be an idle and useless formality."  *Carroll*, No. 1:09-cv-1232, 2010 U.S. Dist. LEXIS 65566, at \*32.

Last, Hawkins's assertion that the ALJ ignored a statement by Lesneski that Hawkins had difficulty managing and dealing with his illness, was unable to obtain employment, and found it hard to deal with his daily activities emanates from a false premise.  The statement that Hawkins quotes and attributes to Lesneski was actually Hawkins's own statement in a report he authored and submitted to the Social Security Administration.  (Tr. 225-33); *see* ECF Doc. 19 at 3.

### C.    Step Four – Weighing of State Consultants' Opinions

Hawkins argues that the ALJ erred by affording "greater weight" to the opinion of the state agency consulting physicians and psychologists than to other sources because they did not have access to evidence provided after they issued their opinions.  ECF Doc. 16 at 11-12.

The Commissioner responds that Hawkins's has failed to establish any prejudicial error in how the ALJ weighed the state agency consultants' opinions by not specifying what evidence would have changed their physical RFC findings.  ECF Doc. 18 at 6.  Moreover, the Commissioner argues that the ALJ considered post-opinion evidence.  ECF Doc. 18 at 6-7.  The Commissioner continues that the ALJ never gave the state agency psychologists greater weight. ECF Doc. 18 at 7.  And the Commissioner contends that it is not *per se* reversible error to give greater weight to a state agency psychologist than to a treating or examining source.  ECF Doc. 18 at 7.

Hawkins's contention that the ALJ erred by relying on the state agency consultants' opinions is underdeveloped.  He asserts that the state agency consultants lacked the benefit of later-submitted evidence, but doesn't specify which evidence or the impact of such evidence upon their mental and physical RFC assessments.  ECF Doc. 16 at 11-12.  Issues raised in such a perfunctory manner risk forfeiture.  *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006).  Nevertheless, his claim is without merit.

31

In the Sixth Circuit, the ALJ may rely on the opinion of a consulting physician who did not have the opportunity to review later-submitted medical records so long as there is "some indication" that the ALJ at least considered the fact that the opinions were outdated before assigning them greater weight.  *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 493-94 (6th Cir. 2016) (quotation marks omitted).  The ALJ discussed Hawkins's medical records through November 2017 and the opinion evidence through January 2018 and indicated that she based her RFC finding on consideration of the entire record.  (Tr. 33-38); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  Thus, there is at least some indication that the ALJ considered Hawkins's post-opinion evidence before she assigned great weight to the state agency consultants' physical RFC findings and some weight to their mental RFC findings.  *See Spicer*, 651 F. App'x at 493-94; *see also Van Pelt v. Comm'r of Soc. Sec.*, Case No. 1:19-cv-2844, 2020 U.S. Dist. LEXIS 244781, at *33 (N.D. Ohio Dec. 30, 2020); *Jacks v. Comm'r of Soc. Sec.*, No. 3:15-cv-309, 2017 U.S. Dist. LEXIS 19229, at *13-14 (S.D. Ohio Feb. 10, 2017).

### D.      Step Four – RFC

Hawkins argues that the ALJ's decision is not supported by substantial evidence because the ALJ ignored and "grossly mischaracterized" certain evidence.  ECF Doc. 16 at 12.  Specifically, he argues that the ALJ mischaracterized the evidence when she "claimed that Mr. Hawkins can complete tasks because he 'lives independently.'"  ECF Doc. 16 at 13.  He argues that this was contrary to Hain's and Dr. Schwartz's statement that he was living in a structured environment.[9]  *Id.*  The Commissioner responds that the ALJ's finding that Hawkins could live independently was consistent with the evidence because the ALJ discussed Hawkins's activities of daily living and Hain's and Dr. Schwartz's statement that he lived in a structured

---

[9] Hawkins also claimed that the ALJ ignored Lesneski's January 11, 2016 function report.  ECF Doc. 16 at 13-14.  That issue has been addressed in Section V.B.5 above.

environment. ECF Doc. 18 at 12. And living in a structured environment was consistent with some independence. *Id.*

The ALJ's finding that Hawkins could live independently was supported by substantial evidence. For one, Hain and Dr. Schwartz – on whom Hawkins relies for the proposition that the ALJ mischaracterized his capacity to complete tasks – stated that Hawkins "tends to his [activities of daily living] independently." (Tr. 681). Further, each and every one of Hawkins's reports of his daily activities stated that he: (1) lives alone; (2) does not need to be reminded to take care of his personal care; (3) does not need assistance with his personal care; (4) prepares meals without reminders and assistance daily; (5) goes shopping without assistance; and (6) can get around by walking or riding in a car. (Tr. 244-47, 256-60, 546-48). And Hawkins testified that he had no problem with self-care, preparing food, or – for all but two days out of the month – household chores. (Tr. 75-77). The only assistance he received for his activities of daily living was transportation to the grocery store once per month, which was consistent with his stated ability to get around by riding in a car. (Tr. 76, 78). The fact that his caseworker didn't allow him to get his own groceries to ensure that he eats a healthy diet does not undermine his ability to live independently. (Tr. 77-78). Nor is it undermined by the fact that he lived in a structured residential community. (Tr. 719).

In short, there is sufficient evidence from which the ALJ could reasonably conclude that Hawkins could live independently. *Biestek*, 139 S. Ct. at 1154. While there may be other evidence – even a preponderance of the evidence – to the contrary, the ALJ's decision must stand. *O'Brien*, 819 F. App'x at 416; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.2d at 545.

### E.       Step Five – VE Testimony

Hawkins argues that the ALJ posed a hypothetical to the VE that did not contain all of his limitations.  ECF Doc. 16 at 16.  Specifically, he contends that the ALJ's hypotheticals did not include Dr. Hermanowski's limitation that he had a poor ability to sustain attention, persist at tasks, and complete them in a timely fashion.  *Id.*  The Commissioner responds that the ALJ was not required to include discounted limitations in her hypothetical questions.  ECF Doc. 18 at 15. The Commissioner further argues that Hawkins had the opportunity to ask the VE questions regarding the ALJ's hypothetical but chose not to.  *Id.*

#### 1.       VE Standard

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715.

### 2.    Analysis

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Hawkins was not disabled at Step Five.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ was only required to incorporate limitations which she found properly supported in the evidence.  *Lee*, 259 F. App'x at 715.  The ALJ rejected Dr. Hermanowski's opinion that Hawkins had a poor ability to sustain concentration, persist at tasks, and complete them in a timely fashion.  (Tr. 36, 543).  She was therefore not required to include those limitations into her hypothetical to the VE.  *See Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("Because the ALJ properly discounted the medical opinions of other doctors, he also properly excluded the limitations assessed by those doctors from the hypothetical questions.").  Because the ALJ's hypothetical to the VE included the limitations which the ALJ found credible and excluded those limitations which were discredited for legally sufficient reasons, the ALJ's determination that Hawkins could perform past relevant work and perform a significant number of jobs in the national economy is supported by substantial evidence.  *Id.* at 586; *Howard*, 276 F.3d at 238.

### F.    New Evidence

Hawkins last argues that the Appeals Council and the Commissioner denied him a fair hearing by refusing to consider his post-decision evidence because the new evidence "established his impairments and limitations exist[ed] long before the ALJ's decision."  ECF Doc. 16 at 15.  He points to a statement supposedly attributable to Lesneski that he stopped working on July 10, 2014 due to extreme difficulty managing and dealing with his condition.  *Id.* (quoting (Tr. 226)).

The Commissioner responds that Hawkins has waived any Sentence Six argument by not requested a remand on that basis.  ECF Doc. 18 at 14 n.4.  The Commissioner argues that any

evidence not submitted to the ALJ cannot be considered by this court in evaluating the ALJ's decision. *Id.*

In his reply, Hawkins reiterates that his right to a fair hearing was denied by the Appeals Council's refusal "to consider the evidence generated prior to February 8, 2018, which supported his claim for disability." ECF Doc. 19 at 3

To the extent that Hawkins seeks review of the Appeals Council's finding that his new evidence was not material, this court has no jurisdiction to consider the matter.  The scope of this court's review is the "final decision of the Commissioner." 42 U.S.C. § 405(g).  Once the Appeals Council declined jurisdiction, the final decision of the Commissioner was that of the ALJ's, not the Appeals Council's rejection of jurisdiction. *Casey v. Sec'y of Health and Hum. Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *accord Thornton v. Comm'r of Soc. Sec.*, 89 F.3d 835 (Table), 1996 U.S. App. LEXIS 32353, at *3 (6th Cir. June 6, 1996).  All this court has authority to do is determine – based on the record before the ALJ – whether the ALJ's decision was supported by substantial evidence or remand if the claimant can show that his new evidence is material. *Wyatt v. Sec'y of Heath and Hum. Servs.*, 974 F.2d 680, 685 (6th Cir. 1992).

The remainder of Hawkins's argument is puzzling.  The new evidence that he presented to the Appeals Council was Dr. Spolter's June 17, 2019 treatment notes for traumatic subdural hematoma and intracranial hemorrhage.  (Tr. 316).  In this court, however, Hawkins points to his own statement to the Social Security Administration – which he again attributes to Lesneski. ECF Doc. 16 at 15 (quoting Tr. 226)).  That aside, a remand would not be warranted.

Hawkins applied for SSI.  To obtain SSI, he had to establish that he was disabled on or before the ALJ's decision – February 8, 2018. *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x 466, 478 (6th Cir. 2016) (citation omitted).  And to obtain a remand, he had to show that the new

evidence was material – "(1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result." *Jordan v. Comm'r of Soc. Sec.*, No. 1:19-cv-2392, 2020 U.S. Dist. LEXIS 168663, at *37 (N.D. Ohio Sept. 15, 2020) (citing *Casey*, 987 F.2d at 1233)).

Hawkins has not attempted to make in this court any showing that Dr. Spolter's treatment notes are relevant. *Rice*, 169 F. App'x at 454; *see generally* ECF Doc. 16; ECF Doc. 19. And they are not. There is no record of treatment for traumatic subdural hematoma and intracranial hemorrhage in the record, nor did Hawkins seek disability on that basis. *See generally* (Tr. 46-90, 212-724). Dr. Spolter's treatment notes fall outside the relevant period and did not discuss Hawkins's condition during the relevant period. (Tr. 316-18). Hawkins's new evidence is therefore not material to whether he was disabled on or before February 8, 2018. *Jordan*, No. 1:19-cv-2392, 2020 U.S. Dist. LEXIS 168663, at *37.

## VI.  Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Hawkins's application for SSI is affirmed.

**IT IS SO ORDERED.**

Dated: June 2, 2021

                                    Thomas M. Parker
                                    United States Magistrate Judge